Vermont Superior Court
Filed 11/18/25
Washington Unit

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 88-2-20 Wncv

| Mountainside Condominium vs. Jamieson Risk Service |
| --- |

## ENTRY REGARDING MOTION

Title:         Motion for Summary Judgment (Motion: 16)
Filer:         Gara M. Seagraves
Filed Date:    June 27, 2025

### Decision on Jamieson's Motion for Summary Judgment

The motion is GRANTED IN PART and DENIED IN PART.

This is a case arising from a fire. The Mountainside Condominium Association (MCA) owns three condominium buildings in Warren, Vermont. In 2014, one of these buildings (Building 3) caught fire and burned to the ground, becoming a total loss. At the time, the buildings were insured by Vermont Mutual Insurance Company under a policy renewed by insurance agency Jamieson Risk Service, Inc. (formerly, Jamieson Insurance Agency, Inc.). In 2016, several owners of the destroyed condominiums (known as the Barsomian plaintiffs) sued MCA (No. 174-3-16 Wncv) claiming that MCA was taking too long to rebuild Building 3 (the Barsomian suit).[1] The Court found that the Board was delaying its duties, and it appointed a receiver, Thomas Lauzon, to undertake the Board's duties. As of now, Building 3 has been reconstructed and the receiver has been discharged.[2]

While MCA was pursuing coverage with Vermont Mutual, MCA filed this case in 2020 against Jamieson, claiming that it breached a duty to MCA to procure or advise, which left MCA with insufficient replacement-value insurance coverage in the event of fire. MCA and Jamieson then stipulated to stay this case pending the outcome of MCA's coverage dispute with Vermont Mutual, which was eventually resolved through arbitration, the awards of which were confirmed in the case

---

[1] While not relevant to this case, the next lawsuit filed (No. 108-2-17 Wncv) was a subrogation action by Vermont Mutual against various third parties, that addressed the cause of the fire.

[2] Whether MCA was acting through its board, or its court-appointed receiver, makes no difference to this decision. For ease of reference, in this decision, the court refers to both simply as MCA.

docketed at No. 22-CV-4513; the awards did not make MCA whole. MCA and the Barsomian plaintiffs then settled the Barsomian suit in 2022. Part of the settlement included an assignment to the Barsomian plaintiffs of MCA's right to pursue this case against Jamieson. The Barsomian plaintiffs were promptly substituted for MCA in this case (and they have amended the complaint twice since). MCA thus is no longer a party to this case, which is between the Barsomian plaintiffs exclusively as MCA's Assignees and Jamieson only. In this case, the Barsomnian plaintiffs "stand in the shoes" of MCA vis-à-vis Jamieson.

The thrust of the operative complaint is that, in 2012, MCA reached out to several insurance agents as part of an effort by MCA to review its Vermont Mutual policy limits, coverages, and costs. MCA had been renewing the existing policy for many years through an agency unrelated to Jamieson. Mr. Jonathan Jamieson (Jamieson's principal at the time) responded to the solicitation by making certain representations as to his relevant expertise and willingness to diligently investigate replacement costs to ensure that MCA had adequate coverage. These responses were qualitatively different than the responses MCA received from other insurance agents. Based on Jamieson's representations, MCA notified Vermont Mutual that Jamieson should be designated its broker for policy purposes, replacing the previous agency.

In Assignees' view, Jamieson then made 3 mistakes that cost MCA dearly: (a) it failed to advise MCA that its Code and Ordinance coverage (code coverage) was woefully insufficient; (b) it advised MCA to obtain Director's and Officer's (D&O) Liability coverage (with an insurer other than Vermont Mutual) that proved useless when the Barsomian suit was filed; and (c) it guided MCA to keep its policy "all-in," which conflicted with its governing documents. In simple terms, code coverage applies to upgrades needed during reconstruction to comply with codes and other legal requirements that normally would not be covered after a loss requiring replacement to a standard comparable to the original. MCA evidently had $100,000 or $105,000 of code coverage for many years and retained that amount after Jamieson's involvement. Assignees claim that Mr. Jamieson should have recognized that a condominium complex such as Mountainside, which was built in the 1970s, would have needed dramatically more such coverage in the event of a catastrophic loss, as happened with the 2014 fire, and should have so advised them.

The complaint is entirely conclusory as to the issue with D&O coverage. As far as the court can tell, the thrust of the claim is that the D&O insurer (not Vermont Mutual) denied any claim for coverage related to MCA's defense and settlement of the Barsomian suit, which saddled MCA with

direct responsibility for liability and defense costs that presumably otherwise might have been covered. The complaint says little more about the matter.[3]

"All in" coverage extends to internal improvements and fixtures made by individual unit owners that, under MCA's governing documents, would have been the responsibility of the individual unit owners rather than MCA. In this case, Assignees allege that the all-in coverage unnecessarily complicated and delayed reconstruction efforts and pitted MCA's interests against those of affected unit owners.[4]

Assignees assert the following claims in the second amended complaint (filed July 8, 2024): Count 1, breach of contract for having not advised MCA as to the need for sufficient code coverage and D&O coverage, and for advising it to keep the policy all-in; Count 2 is the same in substance as Count 1, but reframed as breach of fiduciary duty or negligent procurement of insurance; Count 3 is the same in substance as Count 1 but reframed as negligent misrepresentation; Count 4 is the same as Count 1 but reframed as breach of the implied duty of good faith and fair dealing; and Count 5, violation of Vermont's Consumer Protection Act (CPA), 9 V.S.A. §§ 2451–2494z, due to Jamieson's "false or fraudulent representations or practices." In support of the CPA count, the complaint cites to the entirety of the allegations that precede it without more specifically describing the false or fraudulent representations or practices asserted to amount to a CPA violation.

Jamieson has filed a motion for summary judgment addressing all counts but primarily focusing on them as they relate to the code coverage question. It argues as to all counts that there can be no liability on Jamieson's part because: (1) the policy in fact provided more than sufficient code coverage; (2) MCA's stipulation as to the value of the Vermont Mutual claim acts as a binding waiver in relation to any perceived insufficiency of coverage amounts; (3) even if coverage limits were insufficient, MCA had a "duty to read" the policy rendering it exclusively at fault for any perceived insufficiencies; (4) Jamieson never owed MCA any duty of any kind because it always was

---

[3] Nor is the summary judgment record developed to explicate any issues related to D&O coverage.

[4] They assert in briefing: "From Plaintiffs' perspective, any additional uncovered costs incurred by MCA beyond the [code coverage] shortfall are attributable to [Jamieson's] misguided decision to recommend renewal of 'all-in' coverage contrary to MCA's governing documents." The court simply notes that the record is unclear as to whether there was any shortfall in coverage apart from the code coverage issue. And, if there was, it remains unclear whether any such shortfall was due to the all-in nature of the policy or other matters. There is, for example, evidence that MCA (before the receiver was appointed) spent policy proceeds on non-construction related expenses, and doing so not only diminished policy funds available for construction but contributed substantially to the worsening relationship with Vermont Mutual.

acting as the disclosed agent of his principal, Vermont Mutual, exclusively; (5) even if he had a duty, it was minimal and satisfied because there was no "special relationship" that enlarged it in a manner that could possibly result in liability in the circumstances of this case; and (6) expert testimony is per se irrelevant to the question of a special relationship and whether any resulting duty may have been breached. Jamieson also argues that there are other specific defects based on the elements of each asserted non-CPA claim, the CPA cannot apply to dealings with insurances agents, and the CPA has no merit in any event.

I.      *Procedural standard*

Summary judgment procedure is "an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Morrisseau v. Fayette*, 164 Vt. 358, 363 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Vt. R. Civ. P. 56(c), shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a). Summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial. *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994). The court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Speculation is insufficient. *Palmer v. Furlan*, 2019 VT 42, ¶ 10.

II.      *Code coverage in the Policy*

Jamieson first argues that, to the extent the issue is a deficiency in code coverage, there never was one: the Policy provides plenty of it. Assignees have maintained that the Policy only provided $105,000 in code coverage and beyond that all code-required improvements were excluded from coverage. Jamieson instead interprets the policy to provide code coverage up to the total property coverage limit, or up to that limit plus $105,000, either of which presumably exceeded actual reconstruction costs. What coverage the policy provided is a question of insurance policy interpretation.

As a general matter, the basic principles of insurance policy interpretation are as follows:

When interpreting an insurance policy, this Court follows well-established principles . . . ." "An insurance policy is construed according to 'its terms and the evident intent of the parties as expressed in the policy language.'" An insurance policy "is to be strictly construed against the insurer." "The insurer bears the burden of showing that an insured's claim is excluded by the policy."

Vermont law "requires that policy language be accorded its plain, ordinary meaning consistent with the reasonable expectation of the insured, and that terms that are ambiguous or unclear be construed broadly in favor of coverage." "Words or phrases in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation." Further, "[w]hen a provision is ambiguous or may reasonably be interpreted in more than one way, then we will construe it according to the reasonable expectations of the insured, based on the policy language." However, "the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous." And, "we will not deprive the insurer of unambiguous terms placed in the contract for its benefit."

*Rainforest Chocolate, LLC v. Sentinel Insurance Company, Ltd.*, 2018 VT 140, ¶¶ 6–7, 209 Vt. 232 (citations omitted).

The Policy provides a total property coverage limit of $11,742,952. See Policy Declarations (building valuations), Ex. D at 1.001–1.003; Banket Insurance Endorsement at 1.064; Certificate of Property Insurance at 1.087. In Jamieson's view, there is no applicable limitation on code coverage. It reasons as follows. Policy § E.6.a(4) at 1.024 provides:

In the event of loss or damage covered by this policy:

a. At our option, we will either:

.  .  .

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to (d)(1)(e) below.

Policy § E.6(d)(1)(e) (emphasis added) further provides:

d. Except as provided in (2) through (8) below, we will determine the value of Covered Property as follows:

> (1) At replacement cost without deduction for depreciation, subject to the following:

> .  .  .

> (e) The cost to repair, rebuild or replace *does not* include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

These provisions reflect a *lack* of code coverage generally in the Policy. However, Policy § E.6(d)(1) is deleted in its entirety and replaced by the Advantage Endorsement § I.A (Ex. D at 1.058), which refers to replacement cost but says nothing on its face about any limitation related to code-required improvements. Therefore, in Jamieson's view, what § E.6(d)(1)(e) took away, the Advantage Endorsement gave back, and the policy has no limitation on code coverage but for an ample total property coverage limit.

Jamieson's interpretation of the policy as granting an implied allowance for code upgrades is untenable with other, express provisions found in the body of the policy. Without belaboring the details, Policy excludes code coverage as follows:

> B. Exclusions

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

> > a. Ordinance Or Law

> > > The enforcement or any ordinance or law . . . .

Policy § B.1.a at 1.018. Nothing in § E.6(d)(1) or the Advantage Endorsement alters the applicability of this exclusion. This exclusion was the basis, in part for the dispute with Vermont Mutual, and Jamieson's arguments do not adequately explain why this express exclusion is overcome by the implied provisions of the rider.

The existence of $105,000 of code coverage notwithstanding the general exclusion also has a reasonably obvious basis on the face of the Policy. The Policy provides up to $5,000/building of code coverage as "additional coverage." See Policy § A.5.l at 1.015–1.016 (the relevant additional coverage); Blanket Insurance Endorsement at 1.064 (the $5,000/building limit). It provides an additional $100,000 of code coverage in the Businessowners Coverage Enhancement Endorsement. See the Endorsement at 1.069 (the limit) and 1.073–1.074 (the coverage).[5]

But for those two provisions making $105,000 of code coverage available, the Policy excludes code coverage. Jamieson's argument that the Policy has no particular limit on code coverage is meritless.

III.　　*Waiver*

Jamieson argues that, regardless of any perceived deficiency in code coverage, MCA stipulated to the value of its claim on the policy with Vermont Mutual (at or before arbitration) and this somehow operates as a waiver of Assignees' claims against Jamieson based on any perceived insufficiency of coverage. Jamieson's reasoning on this issue is somewhat difficult to follow. In any event, this argument has no merit when evaluated in the context of the facts of record.

"A waiver is a voluntary relinquishment of a known right and can be express or implied."

*Anderson v. Coop. Ins. Companies*, 2006 VT 1, ¶ 10, 179 Vt. 288 (2006) (citations omitted).

The record contains little evidence of the negotiations leading up to the arbitration and virtually nothing about what happened at arbitration. Mr. Lauzon, in his deposition, however, makes the following clear, at least from his perspective. In summary, he testified that Vermont Mutual made negotiations over MCA's claim unnecessarily and extremely difficult, unfairly attempting to minimize its liability at every turn. A major bone of contention was the value of code-required improvements because the more expenses that got put into the code-required bucket, the more that would be excluded from coverage on MCA's policy altogether (above $105,000). Mr. Lauzon explained that he kept meticulous records of which expenses legitimately belonged in the code-required bucket (slightly over $1,000,000) while Vermont Mutual doggedly insisted on a

---

[5] Assignees' expert, Robert Titus, calculates $105,000 in code coverage by looking solely to the Businessowners Coverage Enhancement Endorsement multiplied by the policy's automatic annual Building Limit increase without any consideration of Policy § A.5.l. The 2012–2013 policy is not in the record. It may not be fully clear what the total applicable code limit was with precision at this time. It is clear, though, that it was $105,000 or something very close to that.

number substantially exceeding $2,000,000. However, just before arbitration, Vermont Mutual relented. It agreed to go with Mr. Lauzon's figure, and then, as he explains, did not contest that amount during arbitration.

It is reasonably clear that the general matter put to the arbitration panel was how much liability Vermont Mutual still had outstanding by that time considering the agreed upon value of code-required improvements and previous payments on the policy. What more specifically happened at arbitration is left to the imagination. The arbitration awards are all that the court knows about the matter. The original award states in total:

> Vermont Mutual Insurance Company shall pay Mountainside Condominium Association $2,031,366.

> As there was not clear and unmistakable evidence that it was the intent of the parties to give the Panel the authority to arbitrate arbitrability, the Panel lacks the authority to rule on Mountainside Condominium Association's claim for interest. The Panel makes no ruling on interest.

Following remand from the superior court, a second award states in total:

1.  Mountainside Condominium Association did not waive its claim for interest.

2.  Vermont Mutual Insurance Company owes Mountainside Condominium Association interest in the amount of $510,905.

The court's best understanding of Jamieson's waiver argument is that MCA waived any argument here that any code-required improvements were excluded from coverage because the policy actually provided that coverage, and Jamieson cannot be liable here for MCA's tactical mistake in misinterpreting the extent of available coverage. But such an argument is completely foreclosed by the terms of the policy, which plainly provided $105,000 in code coverage only. [6]

---

[6] The Court would further note that the record indicates that Plaintiffs sought the maximum amount of coverage through the Receiver but Vermont Mutual interpretated and sought to enforce the policy to exclude any code updates outside of the $105,000, which forced the parties to litigation and eventually arbitration. Therefore, if Jamieson becomes liable in this case but believes that Vermont Mutual wrongly interpreted its policy and wrongly denied Plaintiffs sums sought, thereby exposing Jamieson to liability, then its true remedy is against Vermont Mutual. See *Windsor School Dist. v. State*, 2008 VT 27, ¶ 10 (noting where wrongful acts of one involve another in litigation, then damages and attorney's fees are recoverable).

Otherwise, the court perceives no dispute—certainly none is developed and explained—as to whether this or that expense was properly classified as code-required or not. The record simply does not reveal any right that was known to MCA that nevertheless was voluntarily relinquished. The Court finds no merit to this argument.

## IV.     Duty to read

Jamieson argues that MCA, as an insured, had a duty to read its own policy, and if it was dissatisfied with coverage or limits, it was incumbent on MCA to act accordingly, but it never did—until after the loss, when any insured would desire to have had more complete insurance in place.[7] In Jamieson's view, MCA's failure to examine the terms of the policy and react accordingly interrupts any causation that otherwise could possibly have rendered Jamieson liable; any coverage deficiency necessarily was MCA's fault. Jamiesen cites two cases in its principal brief in support of this argument: *Booska v. Hubbard Ins. Agency, Inc.*, 160 Vt. 305 (1993); and *Bertelson v. Sunbeam Products, Inc.*, No. S0312-04CnC, 2005 WL 5895225 (Vt. Super. Ct. July 7, 2005).

Neither *Booska* nor *Bertelson* supports summary judgment for Jamieson on this matter. In both cases, the insurance agent was subject solely to the most basic duty "to use reasonable care and diligence to procure insurance that will meet the needs and wishes of the prospective insured, *as stated by the insured.*" *Booska*, 160 Vt. at 309–10 (quoting *Rocque v. Co–Operative Fire Ins. Ass'n*, 140 Vt. 321, 326 (1981) (emphasis added)). As *Booska* further explains, "Once a policy is procured as requested and is consistent with the applicable standard of care, *no further duty is owed to the insured by the agent* with respect to this insurance." *Booska*, 160 Vt. at 301 (emphasis added). That is all of relevance that was going on in those cases. There were no circumstances giving the agent any higher duty. Thus, it was incumbent on the insureds to review their policies and determine whether coverage and limits were satisfactory from their perspectives.

In this case, Assignees claim that MCA stood in a special relationship with Jamieson, which gave it an elevated duty. That matter is reasonably disputed and is addressed in a separate section below. In any event, generally, the law is more complex than Jamieson suggests. As some courts have held, when there is a higher duty, the duty to read extends, at most, to defects or errors that are "readily apparent" on the face of the policy. Annotation, *Insured's Duty to Read Insurance Policy as*

---

[7] To an extent, this argument hints that Jamieson may believe that certain MCA witnesses' current testimony as to the relationship between MCA and Jamieson prior to the fire may present credibility questions. Any such credibility questions will be for the jury to determine.

*Affirmative Defense in Claims Against Insurance Agents and Brokers*, 8 A.L.R.6th 549, § 16.  Some courts have held that in those circumstances the failure to read is no bar to liability at all.  *Id.* § 18. According to a learned treatise:

> The insured's failure to read the policy has traditionally been held *not* to be a defense to an action against the agent for failure to procure insurance, on the reasoning that the principal is entitled to assume that the agent performed his or her duty although some courts have allowed the defense, *especially if the insured was knowledgeable.*
>
> In practical terms and as has been recognized by several courts, the issue is one for the trier of fact.  In some instances, the question has been recharacterized by the courts, which have stated that the issue is not whether the insured read the policy, but rather is whether the insured was reasonable in his or her reliance on the agent's representation that the policy as worded actually covered the risk for which the insurance had been requested.

3 Couch on Ins. (3d) § 46:69 (emphasis added); see also *Babiarz v. Stearns*, 57 N.E.3d 639, 654 (Ill. Ct. App. 2016) ("An insured's duty to know the contents of his policy is 'tested in light of the relationship between the insured and his agent.'" (citation omitted)).

In this case, the existence of a special relationship, and the scope of an elevated duty if so, is disputed.  Also, although a commercial policy is at issue, Jamieson appears to have been dealing primarily with laypersons who had no particular insight into how to analyze the language of an insurance policy.  Nor is the question of code-coverage in the Policy a simple one.  Jamieson's Exhibit D—the policy—is 110 pages long.  As far as the briefing goes, Jamieson itself offered an interpretation of its code-requirement provisions that the Court has found lacks support from other sections of the policy and misapplies one section against the plain language of another.  A layperson could hardly have been expected to do better.  The matter of the reasonableness of MCA's reliance on any representations made by Jamieson will be better sorted out by the finder of fact in the context of all the evidence.  Jamieson is not entitled to summary judgment on this issue.

Jamieson argues that it was the fully disclosed agent of Vermont Mutual alone and, as such, it never owed MCA any duty whatsoever.[8]  As previously explained, at a minimum, Jamieson had the basic duty "to use reasonable care and diligence to procure insurance that will meet the needs and wishes of the prospective insured, as stated by the insured." *Booska*, 160 Vt. at 309–10 (quoting *Rocque v. Co–Operative Fire Ins. Ass'n*, 140 Vt. 321, 326 (1981)).  Additionally, as also previously explained, Assignees claim that MCA stood in a special relationship with Jamieson, which gave it an elevated duty, a matter that is reasonably disputed and addressed in a separate section below.

Otherwise, Jamieson's argument appears to be based on a false dichotomy: that an insurance agent can only be an agent of the insured or the insurer and never the twain shall meet.  Not so.  Insurance agents frequently act in a dual capacity:

> A duty to advise is not incompatible with the agent being the insurer's agent.  Dual agency is permissible even in the context of a duty to advise.  "An agent may assume additional duties by an agreement or by holding himself or herself out as having specific expertise . . . .  These duties do not disappear because the agent is also the agent for an insurer.  Dual agencies are not uncommon, and do not negate the agent's duty to the client."

Law of Commercial Agents and Brokers § 2:2; see also *Cambridge Mut. Fire Ins. Co. v. Peerless Ins. Co.*, 880 A.2d 415, 418 (N.H. 2005) ("[T]he same person may represent both the insurer and the insured, thereby creating a dual agency, so long as the agent is not required to assume incompatible duties as part of the dual agency relationship."); 3 Couch on Ins. § 46:34 ("There is in every case an initial question of fact as to whether the agent has in fact acted in a dual capacity or has merely acted as agent for one of the parties throughout the transactions.").

The record is clear enough that Jamieson, in procuring/renewing MCA's policy with Vermont Mutual, was acting as agent for Vermont Mutual in some respects.  It also appears that Jamieson represented other insurers at the same time.  As one treatise explains: "When an agent represents several insurers, the agent may act in different capacities, representing different parties at

---

[8] The parties' focus on the labels—broker v. agent—is not helpful.  "Although [an] insurance agent generally works on behalf of an insurer, whereas an insurance broker works for an insured, courts use the terms 'agents' and 'brokers' interchangeably, and therefore, the terms must be analyzed in light of the facts and circumstances of the particular case." 3 Couch on Ins. § 45:01.

different times. Therefore, when an insurance agent is procuring insurance or completing the application process, courts will find that the agent represents the insured, and when an agent is delivering the policy, collecting premiums, or resolving claims, courts will find that the agent represents the insurer." 3 Couch on Ins. § 45:26 (footnotes omitted); see also *id.* ("Independent insurance agents or brokers are generally considered the agent of the insured, not the insurer.").

Jamieson's argument that it could only be acting exclusively in one capacity or the other, it was acting as Vermont Mutual's agent, and therefore it could not have been acting as MCA's agent or somehow is automatically insulated from liability is out of step with the law. Jamieson is not entitled to summary judgment on this issue.

VI.     *Whether there was a special relationship*

Jamieson accepts that an insurance agent can have an expanded duty to procure or advise in certain circumstances (a special relationship). It argues that the record of this case clearly shows that there was no special relationship and, thus, there can be no expanded duty here. As explained above, an insurance agent generally has a minimal duty to exercise reasonable care in procuring insurance that the insured clearly requested.

As explained in *Booska*, absent a special relationship between the insured (or prospective insured) and the insurance agent suggesting an elevated duty,

> The agent's task is to be generally fair and truthful in explaining the nature of a policy, not to warn the insured about the impact of necessarily complex contract language on every eventuality. As long as the agent does the job *without negligence*, as between the agent and the purchaser, the task of reading and understanding the policy text is that of the purchasers. As we said in *Hill v. Grandey*:
>
> > An agent may point out to [an insured] the advantages of additional coverage and may ferret out additional facts from the insured applicable to such coverage, but he is under no obligation to do so; nor is the insured under an obligation to respond.

*Booska v. Hubbard Ins. Agency, Inc.*, 160 Vt. 305, 310 (1993) (quoting *Hill v. Grandey*, 132 Vt. 460, 468–79 (1974) (emphasis added)). There is virtually no binding case law in Vermont as to what those special circumstances may be and how they may affect the agent's duty.

In this regard, Jamieson's framing of this as more of a duty-to-advise rather than a duty-to-procure case appears accurate, at least regarding code coverage. The summary judgment record reveals no clear request to procure a certain type or amount of coverage that Jamieson failed to procure. See Law of Commercial Agents and Brokers § 2:1 ("An insurance broker is only obligated to follow the insured's instructions when they are 'clear, explicit, absolute, and unqualified.'"). The claim is that Jamieson undertook a duty to advise MCA as to what its insurance needs were, and that advice fell short, largely due to insufficient code coverage.

As one treatise explains: "The agent controls the scope of his or her duties by controlling the scope of the undertaking. Before the agent incurs a legal duty to advise, the agent must undertake a 'special relationship' with the customer. 'Special relationship' is a generic legal term that describes any relationship that creates legal rights and duties between the parties. The nature of the special relationship defines the nature of the rights between the parties." Law of Commercial Agents and Brokers § 2:2. "[W]here an agent holds himself out as a consultant and counselor, he does have a duty to advise the insured as to his insurance needs, particularly where such needs have been brought to the agent's attention. And in so doing, he may be held to a higher standard of care than that required of the ordinary agent since he is acting as a specialist. Accordingly, the agent may be liable to an insured for the damage suffered by his failing to inform him as to a potential source of loss and by his failing to recommend insurance therefor." 16A Appleman, Insurance Law & Practice § 8836 at 64–66 (1981), quoted in Law of Commercial Agents and Brokers § 2:2. "The insured has the burden of proving, with specific evidence, that the agent agreed to expanded duties." Law of Commercial Agents and Brokers § 2:2.

One court has explained the special circumstances that may reveal a higher duty as follows:

> Case examples supporting a finding of a "special relationship" include (1) where the agent misrepresented the nature of the coverage being offered or provided, and the insured justifiably relied on that representation in selecting the policy; (2) where the agent voluntarily assumed the responsibility for selecting the appropriate insurance policy for the insured (by express agreement or promise to the insured); (3) where the agent held itself out as having expertise in a given field of insurance being sought by insured, and the insured relied on that expertise; (4) where the agent or broker exercised broad discretion to service the insured's needs, and received compensation above the customary premium paid for the expert advice provided; and (5) where the agent was intimately involved in the insured's business affairs, or regularly gave the insured advice or assistance in maintaining proper

coverage. These and other cases suggest that a trier of fact may engage in a multiple factor analysis to determine whether a broker shared a "special relationship" with its client. Considerations may include (1) representations by the broker about its expertise; (2) representations by the broker about the breadth of the coverage obtained; (3) the length and depth of the relationship; (4) the extent of the broker's involvement in the client's decision making about its insurance needs; (5) information volunteered by the broker about the client's insurance needs; and (6) payment of additional compensation for advisory services.

*Tiara Condominium Ass'n, Inc. v. Marsh, USA, Inc.*, 991 F.Supp.2d 1271, 1281 (S.D. Fla. 2014) (citations omitted), accord *Turskey v. State Farm Fire and Casualty Insurance Company*, 586 F.Supp.3d 695, 700 (E.D. Mich. 2022); *Ma Amba Minnesota, Inc. v. Cafourek & Associates, Inc.*, 387 F.Supp.3d 947, 953 (D. Minn. 2019); see generally Annotation, *Liability of insurer or agent of insurer for failure to advise insured as to coverage needs*, 88 A.L.R.4th 249. "Where the record contains disputed facts, the resolution of which could provide competent substantial evidence to support a finding of a 'special relationship' between a broker and its client, summary judgment is improper; the matter must be resolved by a jury." *Tiara Condominium*, 991 F.Supp.2d at 1282.

As far as contemporaneous written communications go, the record plainly shows the following. On April 24, 2012, Ms. Rita Nederman wrote to Mr. Jamieson:

> I am on the Board of Directors for Mountainside Condominiums in Warren, VT. On their behalf I have been asked to research agencies with whom we might renew our Master Policy.
>
> We are presently looking for Master Policy quotes on our 3 building/90 unit, 3 commercial building, 9 officer D & O Master Insurance Policy. Our present policy expires in June 2012 and we would like to solicit quotes from your agency.

On April 30, Mr. Jamieson responded that "We would very much like to offer you a proposal." He asked for some basic information to ensure that he could provide an "apples to apples" quote. Ms. Nederman promptly responded with the declaration pages of the current policy, noting that it renews on July 1, 2012. She also offered that MCA could make its new property manager available to show Mr. Jamieson the buildings and answer any questions. Mr. Jamieson responded that he would do his best to beat Vermont Mutual on price. He said, "Thanks for the opportunity. I will e-mail you further questions." Prior to May 24, further communications between Ms. Nederman and

Mr. Jamieson are focused on price. These communications may imply both that MCA was generally content with its coverage but was looking for a better price.

On May 24, Mr. Jamieson sent a message to Ms. Nederman as follows:

Considering the amount of rental that goes on at Mountainside, Vermont Mutual is still you best bet price wise. That being said I recommend a CNA Directors and Officers policy to all my Condo Association clients. I usually add the [CNA] policy to the package and drop the Vermont Mutual Directors and Officers coverage as it's very limited in scope.

We would be very happy to take over the Vermont Mutual policy for you. This would benefit the association by:

1) Having an agent that would diligently review the amount of coverage on a reconstruction cost per sq ft basis annually.

2) Provide your association with superior Directors and Officers coverage.

3) We are a Mad River Valley based business. We assist our condo association clients best

because we work closely with local property managers during claims situations and meet

with boards personally if needed. We also support the local community making it a better

place to own a second home. Your current agent lives in Stowe!

We are proud to insure:

Sterling Ridge

Castlerock

Clairiere

North Lynx

Summit

And The Maples

References available

The message goes on with details about the recommended CNA D&O policy. On June 15, 2012, MCA notified Vermont Mutual that "as of July 1, 2012, we have appointed Jamieson Insurance Agency, Inc., Waitsfield, VT, as our exclusive agent of record with respect to our insurance program." On July 6, 2012, Mr. Jamieson wrote to the chair of MCA's board, Ms. Barbara Brady, among others, as follows:

> There is one more matter to wrap up the renewal of the Mountainside policy. Below is an email I sent in June. In it I outline my only recommended change to the coverage. The Directors & Officers coverage with Vermont Mutual is very basic. We have seen situations where it has fallen short. We recommend a more robust policy from CNA. See a
>
> comparison of coverage's [sic] attached. The cost difference is approximately $1000/yr.
>
> I spent quite a bit of time on a reconstruction cost appraisal of the buildings. I'm satisfied that they are insured for the correct limits. At next renewal we will shop the coverage again and we will probably offer an alternative liability limit structure that could save the association some money without reducing coverage. In summary the associations [sic] property looks great, is insured well, and I'm pleased to be able to serve you.

The minutes from MCA's October 7, 2012, board meeting include this:

> *Rita Nederman has looked at insurance. The association's policy was put out to bid and the decision was made to stay with Vermont Mutual, but switch to John Jamieson. The premium was reduced, but comprehensive went up, and the association is now better covered. Flood insurance was researched after tropical storm Irene. It was decided that the cost of the premium would not be worth the benefit. For what it would cost, insurance is not necessary, as Mountainside is not in a flood plain.

There is little other contemporaneous, written evidence as to the communications between MCA and Jamieson in the record.[9]

The contemporaneous, written evidence is sufficient to reveal a dispute as to whether Jamieson entered into a special relationship with MCA. Jamieson clearly went beyond simply

---

[9] It is apparent from the parties' exhibits that more such evidence exists, but it has not been put before the Court on the record for the purposes of this motion.

fulfilling a specific request for certain coverage. It is not clear that MCA reached out to him initially seeking the services it eventually received, but Mr. Jamieson plainly did not simply give a competitive apples-to-apples quote to see if MCA could save money on its premium. He investigated reconstruction cost and asserted to MCA that coverage limits were appropriate in light of that investigation. He also clearly represented that he had expertise in the condominium insurance niche. It is by no means clear how a finder of fact ultimately will decide the issue of special relationship on the totality of evidence presented at trial, but it is clear that the matter is disputed and must be resolved at trial.

## VI. *Expert testimony*

Assignees' expert report is in the record. In it, Mr. Robert Titus opines that, in its dealings with MCA, Jamieson entered a special relationship with MCA, expanding the duty it owed to MCA, and then breached that duty with the advice provided. Jamieson argues that, as a matter of law, expert testimony on such matters is per se irrelevant. Jamieson asserts: "Since an insurance broker is NOT a professional (and thus has no special relationship in the absence of certain extraordinary facts UNIQUE to what they agreed to or undertook, determined on a case-by-case/fact-by-fact basis), there is no objective, existing and ascertainable standard for an EXPERT to use to opine that there is a Special Relationship here or not."

The court declines to bar, as a matter of law, all expert testimony addressing the matter of a special relationship, the extent or nature of any expanded duty, and whether it was breached. Expert testimony is commonly appropriate or desirable in these circumstances. "While no court has suggested that expert testimony is necessary where the agent's breach is so obvious that it is within the ordinary knowledge and experience of lay persons, several courts have taken the position that expert testimony as to the standard of care is required where the breach involves the agent's professional skills and expertise." Annotation, *Necessity of expert testimony to show standard of care in negligence action against insurance agent or broker*, 52 A.L.R.4th 1232 § 2[a]; see also Law of Commercial Agents and Brokers § 2:2[e] ("In addition to showing special circumstances, the insured must show that the affirmative duty was required by industry custom and practice. Invariably this requires expert testimony."); 3 Couch on Ins. § 46:32 ("Expert testimony is not always required to prove a lack of reasonable care and diligence; an insured may not be required to present expert testimony to establish the standard by which a broker's conduct should be judged when the evidence indicates

that the broker's conduct falls sufficiently below established minimum standards that a jury could find the conduct negligent without expert testimony.").

VII.    *All claims other than the Consumer Protection claim*

Assignees have styled their non-CPA claims as breach of contract, breach of fiduciary duty, negligent procurement of insurance, negligent misrepresentation, and breach of the implied duty of good faith and fair dealing.  These various characterizations amount, as Plaintiffs admitted at oral argument, to one claim in substance: that Jamieson, based on the relationship it cultivated with MCA, undertook a broader duty toward MCA than imposed by the common law and breached it by giving MCA bad advice.

As the claim arises in this case, it sounds in negligence rather than contract (including the good faith and fair dealing claim).  Judge Hoar so concluded in a similar case recently, and his reasoning is highly persuasive as applied to this case.  In short, while the economic loss rule generally prohibits recovery in tort for purely economic losses, a limited exception applies when the parties have a sufficient special relationship (typically a professional relationship) apart from any contract.  The Restatement (Third) of Torts: Liab. for Econ. Harm § 4 recognizes insurance agents as this type of professional, as do many courts.  As a broader principle of agency law, agents have a duty sounding in negligence to execute their principals' instructions.  The few Vermont cases that have addressed an insurance agent's duty to the insured, although not monolithic, generally have used the language of negligence.  See *Frey v. American Nat. Ins. Co*, No. 59-11-19 Gicv, 2022 WL 14652545, **3–4 (Oct. 17, 2022).  Based on these observations, it is apparent that Assignees' claim, as in *Frey*, is most sensibly understood through the lens of negligence rather than contract law.

Moreover, the only relevant "contract" in this case would be one that was implied in the back-and-forth communications between the parties, which is the precise basis for the alleged special relationship that expands the common law duty.  There was no written contract between MCA and Jamieson and, as far as the record goes, nor was there any clear contract-like negotiations or payment for service.

Additionally, it is far from clear what the utility of characterizing the claim under contract law would be in this case.  The summary judgment record includes no evidence that clearly shows any agreement as far as how and to what extent Jamieson might review anticipated reconstruction costs, what any subsequent determination of the sufficiency of coverage would mean, or, more

broadly, what the scope of the advice he was expected to provide was. The essential terms of a contract must be "reasonably certain." Restatement (Second) of Contracts § 33(2). "If the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id.* § 33 cmt. a. If the principal alleged harm in this case is the lack of code coverage, then the contract had to be sufficiently clear that Jamieson was expected to advise on code coverage. The summary judgment record is seriously opaque as to what "agreement" the parties had and what performance may have been required by Jamieson under it.

Again, the evidence that is in the record raises a question as to whether Jamieson, in dealing with MCA, undertook a broader duty of care than imposed by the common law—regardless whether there was any contract. If so, the question will turn to one of standard of care and breach. A negligence framework makes more sense in this case than contract law.

Nor does framing the issue as one of fiduciary duty add anything. Typically, to the extent that there may be a *limited* fiduciary relationship between the insurance agent and insured, that is the basis for the common law imposition of a basic duty of care and for the enhanced duty in the case of a special relationship. See Law of Commercial Agents and Brokers § 2:2 ("There are times when insurance agents step into a fiduciary relationship, undertaking to advise the customers about their uninsured risks and the policies that are available to fill those coverage gaps. The advisor-client relationship is a special relationship that imposes an affirmative duty on the agent to assist and protect the insured."); *id* § 2:1 ("However, in most cases, this fiduciary duty focuses on faithfully and skillfully following the insured's coverage instructions."). Accordingly, there is no meaningful distinction between a negligence claim in this context or a breach of fiduciary duty claim.

As to the negligence claims, the court construes the "negligent procurement" claim to encompass negligence as to either the procurement of insurance or advice as insurance needs. The negligent misrepresentation claim is not discernibly based on different facts and would not support any different measure of liability. It appears to be entirely duplicative.

For these reasons, the court clarifies that it discerns among the non-CPA claims one negligence claim which, as pleaded, has three predicates: the insufficiency of code coverage, the ineffectiveness of D&O coverage, and the existence of all-in coverage.

As to Assignees' negligence claim, Jamieson argues that there can be no negligent procurement claim insofar as there is no evidence of any clear instruction to procure anything that was not obtained. As framed, the court agrees.

However, the nature of the claim is centered on the advice that Jamieson provided (the expanded duty being predicated on a special relationship). About that, Jamieson argues:

> Plaintiffs can never satisfy the prima facie element of "justifiable reliance". There is no way for the Plaintiffs to argue that the Board….the very entity legally responsible for maintenance, repair, upkeep and care of this Condo Complex….for 50 years….and who hired a real estate manager, was not in the best position to know what, if any building code changes were made that would affect the building of the complex should a casualty loss ever occur. It was their responsibility. In fact, the by-laws explicitly stated they were the only ones with the ability to hire contractors, engineers, architects to investigate the local codes and ordinances, the flood law changes, EPA law changes. Exh __, Pg. __/It is not the other way around.
>
> Here the Board clearly knew the C&O limits…since they were the same ones for years. They cannot now claim that they justifiably relied on anything Jamieson to determine if they had sufficient C&O coverage.

The court agrees that Assignees will have to prove, and the jury—based on all the evidence presented—will have to determine whether MCA justifiably relied on any bad advice provided by Jamieson in breach of any expanded duty of care arising out of the parties' special relationship, if there was one. However, Jamieson's argument on this issue on summary judgment is implicitly predicated on the lack of any special relationship, which, if found, will inform the applicable standard of care and whether there was any breach. The court already has determined that the matter of a special relationship must be put to the jury.

Assignees' negligence claim survives summary judgment.

## *VII    The CPA claim*

Jamieson reiterates its argument that the CPA cannot apply to the insurance marketplace or to insurance agents vis-à-vis insureds or prospective insureds. The Court squarely rejected this argument in its June 28, 2024, decision, and it will not revisit the matter now. *Mountainside Condominium v. Jamieson Risk Service*, No. 88-2-20 Wncv, 2024 WL 4172976 (Vt. Super. Ct. June 28,

2024). Separately, Jamieson argues that the CPA claim simply has no merit in the context of this case.

"The three elements of a [CPA] claim are as follows: '(1) there must be a representation, practice, or omission likely to mislead the consumer; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be 'material,' that is, likely to affect the consumer's conduct or decision with regard to a product.'" *Gregory v. Poulin Auto Sales, Inc.*, 2012 VT 28, ¶ 12, 191 Vt. 611 (citation omitted).

Assignees described their CPA claim as follows:

> In many respects, Plaintiffs' claim is akin to a classic case of bait-and-switch. "The language of the statute addresses the classic bait-and-switch technique by which a seller induces consumer interest with an attractive offer and switches to other merchandise or terms, considerably less advantageous to the consumer." *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 136 (1993). [Jamieson] wished to . . . replace its competitor, T.S. Peck, as MCA's insurance broker. To achieve success, Mr. Jamieson made a number of promises regarding expertise, reviews of construction costs, and annual assessments regarding the adequacy of MCA's insurance coverage. Once MCA was reasonably induced to retain JRS on the basis of those promises, however, JRS failed to perform consistent with those promises. JRS's failure to perform was ultimately catastrophic, leading to (1) woefully inadequate O&L coverage (leading to an insurance shortfall exceeding $1 million) when Building 3 was destroyed by fire, and (2) unnecessary complexities created by the renewal of all-in property and casualty coverage that was incompatible with MCA's governing documents.

In other words, Jamieson cultivated a special relationship with MCA that broadened its common law duty to one of providing certain expert advice, and then it breached that expanded duty by negligently advising MCA. It is thus clear that Assignees' purported CPA claim is simply a negligence claim under a different label.[10]

Assignees do not clearly identify any "promise" about Jamieson's expertise. A promise is "a person's assurance that the person will or will not do something." Black's Law Dictionary 1228–29 (7th ed. 1999). A representation that Jamieson had specific expertise with the type of insureds and

---

[10] This is equal true in terms of Plaintiff's "bait and switch "theory, which is essentially a recasting of the reliance that Plaintiffs claim to have derived from Jamieson's representations of expertise, which they claim kept them from seeking or knowing that they needed to seek expertise from another.

insurance at issue in this case is an important component to Assignees' claim of a special relationship for negligence purposes, but it is not on its own a promise to do anything. Nor is it clear what "promise" Jamieson may have made about evaluating construction costs. Either way, it is undisputed that Jamieson in fact did undertake to determine reconstruction costs, and he reported his conclusion as to that matter as well as his opinion on what that calculation meant as far as the sufficiency of MCA's coverage. It is similarly unclear what deficiency Assignees intend to point out with any disappointment in some failure to conduct annual reviews. The allegedly bad advice that MCA received, it received proximate to its initial policy renewal with Jamieson, which remained the agency though which the policy was again renewed for the period during which the fire happened.

Assignees' claim in substance appears to be that Jamieson led MCA to believe that it would perform with competence (without negligence), and it did not—it was negligent. In *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 133 (1993), the Court explained that "Our cases have often drawn a distinction between a statement of fact and a statement of opinion, holding that misrepresentation of the former can be fraud, but misrepresentation of the latter cannot." "This generalization is not, however, without exceptions. Misrepresentation of opinion can be the basis of a fraud claim if it is part of a scheme to defraud." *Id.* Regardless of whether Jamieson's performance was "competent," there is no allegation or evidence of any scheme to defraud in this case. The *Winey* Court went on to say, "With respect to promises to perform, we have held that misrepresentations about future actions can be fraudulent if defendant, at the time of the statement, intends to act differently from the promise." *Id.* Again, there is no nonconclusory allegation or evidence that Jamieson ever made any promise to perform while secretly intending to act differently than as promised.

In *Kessler v. Loftus*, 994 F.Supp. 240 (D.Vt. 1997), a case involving allegedly bad legal advice from an attorney, the district court distinguished between "the commercial, entrepreneurial aspects of law," which may provide a basis for a CPA claim, and the "legal, advisory, analytical aspects of law," which may give rise to a negligence claim but generally will not give rise to a CPA claim (absent a scheme to defraud). *Id.* at 242. In *Webb v. Leclair*, 2007 VT 65, ¶ 23, 182 Vt. 559 (citation omitted), the Court adopted the rationale of *Kessler* and extended it to "other professionals": "We now expressly adopt the *Kessler* court's interpretation . . . that although certain representations may give rise to a malpractice claim, they are generally not actionable under the [CPA] if they are the product of the defendant's 'professional judgment based upon his legal knowledge and skill.' A plaintiff cannot simply recast a malpractice claim as a consumer fraud claim. Moreover, for

purposes of this rule, we see no meaningful distinction between lawyers and other professionals hired to give a 'specialized or expert interpretation' of a matter." See also *Otis-Wisher v. Fletcher Allen Health Care, Inc.*, 951 F.Supp.2d 592, 603 (D.Vt. 2013) ("As the Vermont Supreme Court has noted, the [CPA] was not meant to provide a second method to plead a malpractice or negligence claim."). As Assignees frame matters, every negligence claim against an insurance agent would amount to a CPA claim. See, in slightly different circumstances, *Greene v. Stevens Gas Service*, 2004 VT 67, ¶ 15, 177 Vt. 90 ("His argument is that by denying coverage [insurer] deceived plaintiff into believing his only recourse was against [alleged tortfeasor]. Under that logic, any denial of coverage becomes consumer fraud.").

This case is not about Jamieson tricking MCA into thinking that it would do something that it never intended to do. It is about whether Jamieson's performance was deficient measured against the standard of care arising out of the alleged special relationship between Jamieson and MCA, or whether Jamieson was subject only to the minimal duty imposed by the common law. As to the former, that performance relates to complex matters of insurance policy interpretation, in relation to Jamieson's duty and applicable professional standards, if there was any expanded duty, to determine MCA's insurance needs and so advise it.

MCA's negligence claim survives the summary judgment stage. Its CPA claim is no more than its negligence claim impermissibly recast as a negligence claim and does not.

*Summary*

In sum, Jamieson has failed to demonstrate that: (a) the policy provided code coverage in excess of any related loss suffered by MCA; (b) MCA waived any claim related to a deficiency in code coverage; (c) the duty to read automatically insulates it from liability in this case; (d) Jamieson could not have been MCA's agent to any extent; (e) as a matter of law Jamieson had no special relationship with MCA; and (f) expert testimony related to a special relationship or breach of any related duty is per se irrelevant. In substance, Assignees' claims boil down to one claim of negligence and one CPA claim. The negligence claim survives summary judgment; the CPA claim does not.

*Order*

For the foregoing reasons, Jamieson's motion for summary judgment is **Granted in part and denied in part**. Plaintiffs' contract-based claims and Consumer Protection Act Claims are **Dismissed** the remainder of Plaintiffs' claims may proceed, and the Court will set this for a pre-trial conference.

Electronically signed on 11/18/2025 3:43 PM pursuant to V.R.E.F. 9(d)

_____
Daniel Richardson
Superior Court Judge